J-S21004-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: D.R., A MINOR | : IN THE SUPERIOR COURT OF |
| | :     PENNSYLVANIA |
| | : |
| APPEAL OF: L.A., MOTHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 257 MDA 2026 |

Appeal from the Decree Entered January 13, 2026
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  056-ADOPT-2025

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:          **FILED: AUGUST 6, 2026**

L.A. ("Mother") appeals from the decree involuntarily terminating her parental rights to her son, D.R., born in July 2016.[1]  We affirm.

We glean the following facts from the certified record.  Father and Mother (collectively, "Parents") have a history of using illegal drugs and residing in a deplorable mobile home.  Cumberland County Children & Youth Services ("CYS") first encountered this family in 2020, following a report that Mother had overdosed on opiates in the presence of then-four-year-old D.R. and the family residence was so "cluttered" as to be impassable.  ***See*** N.T.,

---

[1] By decree also entered on January 13, 2026, the orphans' court involuntarily terminated the parental rights of D.R.'s father, T.R. ("Father").  Father filed an appeal at 239 MDA 2026, which we address in a separate memorandum.

1/13/26, at 53-54.  After validating those allegations, CYS briefly opened and subsequently closed a case the following year.[2]

A second report, received on October 4, 2024, precipitated the proceedings now before this Court.  It alleged that Parents continued to engage in illegal drug use and their mobile home lacked running water.  A CYS caseworker investigated that day and observed that "the floors in the trailer were caving in," and trash was piled so high that a responding police officer "could not walk inside the residence." *Id*. at 25, 53.  Father also informed the caseworker that the family used "a porta potty at a local construction site as the bathroom[.]" *Id*.  The agency further verified Parents' use of illegal drugs. *Id*. at 24.  CYS immediately sought and was awarded emergency protective custody of D.R., who was placed with his maternal great-grandparents under a safety plan.

Based on the foregoing, Parents were each charged with one count of endangering the welfare of a child.  The orphans' court adjudicated D.R. dependent after a hearing on December 9, 2024, and he remained with his great-grandparents.  D.R.'s permanency goal was set as reunification with Parents, and in furtherance of that goal, Mother was required to provide a safe and habitable home for D.R.; obtain parenting, mental health, and drug and

_____

[2] The record does not indicate whether dependency proceedings commenced, but it does not appear that D.R. was adjudicated dependent at that time.

alcohol evaluations and follow the resulting recommendations; participate in drug testing; and attend supervised visitation with D.R. *Id*. at 26-29, 31-36.

The first permanency review hearing commenced on May 12, 2025, and the court found that Mother had been in substantial compliance with the permanency plan and made moderate progress toward alleviating the circumstances that necessitated D.R.'s placement. However, at the second hearing on October 14, 2025, the court determined that Mother had been in minimal compliance with the permanency plan and made minimal progress. Specifically, she failed to obtain a drug and alcohol evaluation and had not participated in the required drug testing through the Restorative Sanctions Office ("RSO"). She also continued to reside in the same mobile home with no substantial progress in making it safe for D.R., despite receiving support through, *inter alia*, Keystone Family Services to make physical improvements to the residence. D.R. was also relocated from the home of his great-grandparents, where he had resided for one year, to the home of his maternal grandparents, who wish to adopt him.

The court directed Mother to report to RSO immediately after the hearing, but she left without providing a specimen, although she was warned that failure to do so would be presumed a positive result. *See* CYS Exhibit 3 (Permanency Review Order, 10/14/25). Three days later, she tested positive for amphetamines, methamphetamine, and fentanyl, and again for the same substances five days thereafter. *See* N.T., 1/13/26, at 30-31. Following the

- 3 -

second test, Mother promptly entered Roxbury Treatment Center ("Roxbury") for inpatient treatment.

On November 6, 2025, CYS filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[3] The evidentiary hearing occurred approximately two months later, wherein then-nine-year-old D.R.'s legal and best interests were represented by legal counsel and a guardian *ad litem*, respectively. D.R. testified *in camera* in the presence of all counsel and expressed his preference to remain in the home of his maternal grandparents until he is "a grown-up." N.T., 1/13/26, at 10.

CYS then presented the testimony of Sandra Gibson, the CYS caseworker; Jennifer McWilliams, the visitation supervisor at ABC House, where Mother's supervised visits occurred; and D.R.'s maternal grandmother ("Maternal Grandmother"). Ms. Gibson testified that Mother was successfully discharged from Roxbury on November 19, 2025, after approximately twenty-eight days of inpatient detoxification. *Id*. at 29. She attended a follow-up evaluation, began a recommended eight-week program, and remained enrolled at the time of the termination hearing. *Id*. at 29-30. Since her discharge from Roxbury, all eight of her RSO drug screens were negative. Ms.

---

[3] Less than two weeks thereafter, Mother pled guilty to endangering the welfare of a child and was sentenced to one year of probation.

Gibson confirmed that Mother's "counselor reports that she is engaged in treatment and is doing well and is motivated to maintain sobriety." *Id*. at 30.

Mother also self-reported diagnoses of, *inter alia*, anxiety and depression and was ultimately evaluated while inpatient at Roxbury. She was determined to have severe "opioid use disorder; opioid withdrawal; and a depressive disorder." *Id*. at 32-33 (cleaned up). Mother was previously prescribed medication for those conditions, however Ms. Gibson testified that Mother reported to her Roxbury physician that she was "noncompliant with her prescribed medication for the past six months." *Id*. at 33. At the time of the termination hearing, Mother was receiving mental health treatment at Sadler Health Center and taking her prescribed medication. *Id*.

Ms. Gibson explained that she had not been inside Parents' mobile home since April of 2025, but observed that from "the exterior of the home . . . the conditions have remained the same, if not worse." *Id*. at 26. Although Parents "talked about" obtaining another residence through the housing authority, "nothing ha[d] been done to [Ms. Gibson's] knowledge on that end." *Id*. at 28-29.

Finally, Ms. Gibson confirmed that Mother attended the required parenting assessment, which resulted in a recommendation that she participate in a parenting skills program. However, that program was available "only once a home was approved as a reunification site, which to date . . . has not occurred, so there [have] been no skill sessions that have

taken place." *Id*. at 33-34. Ms. McWilliams further established that Mother's visitation attendance was inconsistent, as she attended thirty-four out of fifty-three sessions. *Id*. at 14.

Mother appeared and testified on her own behalf.[4] She acknowledged that she had "battled" substance abuse "for years" and explained that she attended inpatient drug and alcohol rehabilitation twice before, in 2020 and 2023, and upon discharge on both occasions she relapsed within six months. *Id*. at 96, 106.

By decree, the orphans' court involuntarily terminated Mother's parental rights pursuant to the statutory grounds alleged. Mother timely appealed, and both she and the orphans' court complied with their respective Pa.R.A.P. 1925 obligations. Mother now raises the following issues for review:

> 1. Whether the [orphans' c]ourt abused its discretion and committed an error of law when it found that sufficient grounds existed for a termination of [Mother]'s parental rights to [her] child, despite a lack of clear and convincing evidence, thus contravening [§] 2511(a) of the Adoption Act, 23 Pa.C.S. § 2511(a).
>
> 2. Whether the [orphans' c]ourt abused its discretion and committed an error of law in terminating [Mother]'s parental rights when the conditions which led to the removal or placement of the child no longer existed or were substantially eliminated, thus contravening [§] 2511(a) and (b) of the Adoption Act, 23 Pa.C.S. § 2511(a), (b).
>
> 3. Whether the [orphans' c]ourt abused its discretion and committed an error of law in determining it would be in the child's best interest to have parental rights terminated when [Mother], if

---

[4] Father likewise appeared and testified against his termination.

given sufficient time, would be ready, willing, and able to parent the child and provide for his needs, thus contravening [§] 2511(b) of the Adoption Act, 23 Pa.C.S. § 2511(b).

Mother's Brief at 4-5 (citations altered).[5]

A summary of the pertinent legal principles is illustrative:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

_____

[5] D.R.'s guardian *ad litem* filed a letter in this Court advocating for affirmance of the decree based upon the reasons outlined in the court's Rule 1925(a) opinion.

- 7 -

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (citations omitted) (cleaned up).

The involuntary termination of parental rights is governed by § 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under any one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to § 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). We need only agree with the court's determination as to any one subsection of § 2511(a), in addition to § 2511(b), to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

In this matter, we analyze the decree involuntarily terminating Mother's parental rights pursuant to § 2511(a)(8) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>     . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, [twelve] months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

- 8 -

. . . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The following three elements must be satisfied to establish § 2511(a)(8):

(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child.

*In re M.E.*, 283 A.3d at 832 (cleaned up). We have explained that, unlike other subsections:

[Section] 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. The relevant inquiry regarding the second prong of § 2511(a)(8) is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing. . . .

Although § 2511(a) generally focuses on the behavior of the parent, the third prong of § 2511(a)(8) specifically accounts for the needs of the child. This Court has recognized that the application of [§ 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children.

However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Id*. (cleaned up).

Although the third prong of § 2511(a)(8) encompasses the needs and welfare analysis typically reserved for § 2511(b), "we are required to resolve the analysis relative to [§] 2511(a)(8), prior to addressing the needs and welfare of [the child], as proscribed by [§] 2511(b); as such, they are distinct in that we must address [§] 2511(a) before reaching [§] 2511(b)." *In re E.J.C.*, 335 A.3d 1222, 1231 (Pa.Super. 2025) (cleaned up); *see also In re Adoption of G.W.*, 342 A.3d 68, 89 n.20 (Pa.Super. 2025) (*en banc*) (applying the precedent interpreting § 2511(a)(8) and (b) "congruently and using the same legal analysis" for both subsections).

A needs and welfare analysis pursuant to both § 2511(a)(8) and (b) require consideration of "intangibles such as love, comfort, security, and stability." *In re I.J.*, 972 A.2d 5, 12 (Pa.Super. 2009) (cleaned up). The court must further analyze:

[T]he importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. The court must consider whether a natural parental bond exists

between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

*Id*. (cleaned up).

Instantly, concerning § 2511(a)(8), Mother concedes that that the first prong is met because D.R. had been removed from her care for more than twelve months. The crux of her argument, rather, is that the evidence was insufficient to establish the second prong of this subsection because the conditions that led to D.R.'s removal "either have been, or could be remedied, in a reasonable period of time[.]" Mother's brief at 16. She asserts that she "had successfully completed inpatient drug rehabilitation and was engaged in ongoing intensive outpatient services as recommended." *Id*. Her lack of financial resources, Mother explains, has kept her from securing safe and appropriate housing for D.R., but she is working towards this goal. *Id*. Mother also argues that the evidence was insufficient under the third prong of § 2511(a)(8), and § 2511(b), because the court failed to conduct a bond analysis. *Id*. at 17.

As to the second prong of § 2511(a)(8), the orphans' court determined that the conditions leading to D.R.'s placement continued to exist as follows:

[Mother] remains in the same unsafe and uninhabitable home that D.R. was removed from despite receiving services to assist her in making the home safe and habitable. Mother was not addressing her drug and alcohol issues, including failing to test and failing to receive drug and alcohol treatment. Only in the last two months prior to the termination hearing did she initiate the beginning phases of addressing her drug and alcohol goals. Her lack of

sobriety for a significant period of time and lack of safe and stable housing has prevented her from receiving necessary and recommended parenting skills. Mother remains in a relationship with Father, who has not addressed his drug and alcohol issues at all and continues to test positive for illegal substances as recently as days prior to the termination of parental rights hearing. Neither parent has safe, stable or appropriate housing for reunification to occur with D.R. D.R. has now been in care for [fifteen] months with no swift or discernable path to reunification with either of his parents.

Orphans' Court Opinion, 3/16/26, at 10-11 (pagination provided).

The record supports the court's findings. At the time of D.R.'s adjudication, Mother tested positive for methamphetamine and fentanyl. *See* N.T., 1/13/26, at 30-31. Like Mother's delay in obtaining a drug and alcohol evaluation, she also failed to timely comply with drug screening at RSO until after the second permanency hearing. *Id*. at 30-31. She continued to reside in the same unlivable mobile home, and since she failed to secure a suitable reunification site, Ms. Gibson explained that Mother was unable to attend any parenting session. *Id*. at 26, 33-34. The issues relating to Mother's mental health have also not been fully remedied where she reported to her physician that she did not take her prescribed medication for six months. *Id*. at 33. Ms. McWilliams further verified that Mother had attended only sixty-four percent of the offered visitation sessions. *Id*. at 14.

Accordingly, contrary to Mother's argument, the foregoing evidence confirms that the issues related to substance abuse, housing, mental health, visitation, and parenting persisted at the time of the termination hearing, and reunification was not imminent. *See In re I.J.*, 972 A.2d at 11. Although

Mother has recently made strides to address her addiction and mental health, we may only review her efforts prior to the petition being filed. *In re M.E.*, 283 A.3d at 832 Thus, we hold that the orphans' court did not abuse its discretion in concluding that the evidence satisfied the second prong of § 2511(a)(8).

Likewise, we discern no abuse of discretion where the orphans' court determined that CYS established the third element of § 2511(a)(8). Mother asserts that the court failed to consider the effects of terminating the bond between her and D.R., but this is simply untrue. In its Rule 1925(a) opinion, the court explained:

> The [orphans'] court has thoroughly examined the impact termination of parental rights will have on D.R.'s developmental, physical and emotional needs as well as his overall welfare. The record demonstrates the termination of Mother's parental rights will not result in D.R. suffering extreme emotional consequences or irreparable harm. D.R. is comfortable and wants to remain in the home of his maternal grandparents. . . . His maternal grandparents are able to provide him with permanency through adoption.

Orphans' Court Opinion, 3/16/26, at 10.

Ms. Gibson's testimony supports the court's findings insofar as she stated that, during her interactions with D.R., he did not discuss seeing Mother. *See* N.T., 1/13/26, at 55. She observed that D.R. displayed affection toward his maternal grandparents, even though she has otherwise found him to not be "a super affectionate child." *Id*. at 56. Ms. Gibson opined that there would be no detrimental effect upon D.R. if Mother's parental rights were

terminated, and both she and Maternal Grandmother stated that D.R. is doing "very well." *Id*. at 38, 42, 65. For example, a school meeting occurred in December of 2025, when D.R. was in fourth grade, to discuss his progress within the Individualized Education Program ("IEP"). The program included assistance with mathematics and writing, as well as a plan to improve his social behavior, the latter of which "he [wa]s at the goal." *Id*. In addition, the IEP provided him with "appropriate" behavioral responses to problems, and the school reported that sixty-five percent of this goal had been met. *Id*. Finally, we observe that Maternal Grandmother desires to adopt D.R. and described him as "a great kid. He does struggle with behavior sometimes, in school especially. He loves trains, roller coasters, and we support that for him. He's just a joy to have around." *Id.* at 65.

Based on the foregoing, we discern no abuse of discretion in the court's conclusion that terminating Mother's parental rights would best serve D.R.'s needs and welfare based upon the third prong of § 2511(a)(8). Thus, Mother's arguments fail with respect to § 2511(a)(8).

Finally, we consider the decree pursuant to § 2511(b), which requires that the "primary consideration" for a court in considering an involuntary termination petition is the child's "developmental, physical and emotional needs and welfare." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023); *see also* 23 Pa.C.S. § 2511(b). This Court has stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs

- 14 -

and welfare of the child." *In re C.W.U., Jr.*, 33 A.3d 1, 6 (Pa.Super. 2011) (citation omitted). The child's bond with the parent, "plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the [§] 2511(b) analysis." *K.T.*, 296 A.3d at 1109. The *K.T.* Court also emphasized the court must consider whether, in the context of all these factors, the parental bond is "necessary and beneficial" to the child. *Id*. A bond is considered "necessary and beneficial" if its severance would cause extreme emotional consequences or significant, irreparable harm. *Id*. at 1109-10.

Courts must additionally "consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. In weighing the bond considerations, "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. at 269.

We conclude that the court did not abuse its discretion under § 2511(b) for the same reasons provided in our analysis of the third prong of § 2511(a)(8). Indeed, upon thorough review of the record, there is no indication that D.R. shares a necessary and beneficial bond with Mother. Rather, the evidence reveals that he shares such a bond with his maternal

grandparents who seek to adopt him. The evidence is clear and convincing in this case that terminating Mother's parental rights in anticipation of the child's adoption by his maternal grandparents will serve the developmental, physical, and emotional needs and welfare of D.R. pursuant to § 2511(b). As such, we affirm the decree of the orphans' court terminating Mother's parental rights.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 08/06/2026